**TEXAS EASTERN TRANSMISSION CORPORATION, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

**No. 19046.**

United States Court of Appeals
Fifth Circuit.

July 19, 1962.

---

Keith M. Pyburn, Washington, D. C., David T. Searls, Jack D. Head, J. Evans Attwell, Houston, Tex., Frederick H. Clark, New York City, for petitioner.

John C. Mason, Gen. Counsel, F. P. C., Howard E. Wahrenbrock, Sol., F. P. C., Ralph S. Spritzer, Gen. Counsel, F. P. C., Milton J. Grossman, Atty., F. P. C., Washington, D. C., for respondent.

Before RIVES, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

Of all of the litigation arising under the Natural Gas Act, this is a most unusual case. The first, at least of recent vintage, and perhaps the last of its kind, it does not really challenge an order of the Federal Power Commission as such. What is involved is a settlement agreement—a voluntary settlement contract made by parties in an adversary position, and thereafter approved by the Commission as the basis for tariff rates. The tariffs or rates, as such, are likewise not in question. The dispute is an everyday run-of-the-mill controversy over the interpretation and meaning of the settlement agreement. All of this comes in a sort of a back door process. For the problem arises because the Commission by the letter order nominally under review, § 19(b), 15 U.S.C.A. § 717r(b), has directed Petitioner to make certain refund payments pursuant to that settlement. The correctness of that order immediately depends on the correctness of

the Commission's interpretation of the private contract. Except, perhaps, as to interest as a sanction for nonperformance, the Commission does not undertake to make any substantive orders on the basis of any provisions of the Natural Gas Act. What, and all, it does is to order the Petitioner to do what the Commission conceives the contract calls for. Though the parties are at odds as to the Commission's reading of this agreement, there is no controversy over its power and duty to act.

In assaying that problem, there is really not a significant difference over a significant principle of law. The case boils down to the one simply stated: what did the parties mean? The usual aid to construction of contracts are advanced pro and con, but as with statutory construction, the familiar canonical formulae are of so little real help until the decision is reached whereupon each fits perfectly into the predetermined conclusion. Hattaway v. United States, 5 Cir., 1962, 304 F.2d 5 [No. 19228, June 6, 1962]. We must recognize, of course, that here, as in every situation of contract interpretation, the Court must put itself in the position of the parties. Fidelity-Phenix Fire Ins. Co. v. Farm Air Service, Inc., 5 Cir., 1958, 255 F.2d 658 at 660; Indemnity Ins. Co. of North America v. Du Pont, 5 Cir., 1961, 292 F.2d 569, 574; U. S. Industries, Inc. v. Camco, Inc., 5 Cir., 1960, 277 F.2d 292 at 295, 296, note 14. That means that we must read the agreement in the setting of the Natural Gas Act. This includes the relative rights and duties of parties to the underlying transactions and the nature and scope of the controversies out of which this hoped-for solution came into being.

These comments we regard as something more than a mere introductory preface. For Commission approved voluntary settlements are an important and desirable mechanism as the Commission undertakes the staggering burden of dealing with the ceaseless flow of the ever-more complicated problems facing an inadequate staff as a result of the celebrated 1954 Phillips decision.[1] Consequently settlements should be encouraged, not discouraged.[2] And while the

---

1. Phillips Petroleum Co. v. Wisconsin, 1954, 347 U.S. 672, 74 S.Ct. 794, 98 L. Ed. 1035.

2. The Commission is the first to recognize the indispensability of settlements. It regards promotion of voluntary settlements to be a duty imposed by law. In its September 11, 1958 order on the related Mississippi River-United dispute it had this to say:
   "However, settlements, as a rule, are favored in the law. § 5(b) of the Administrative Procedure Act requires us to afford all interested parties in proper proceedings opportunity for, among other things, offers of settlement, or proposals of adjustments, where time, the nature of the proceeding, and the public interest permit."
   Moreover, settlements are imperative as a practical matter. See the First Quarterly Report (Release No. 11,991, G–6559) of May 1962. The Chairman reported that
   "* * * as of March 31 the total dollar amount of pending pipeline rate increase cases had been reduced by over 40 million dollars in the first three months

of 1962, from $388,190,900 as of December 31, 1961, to $347,131,800 on March 31, 1962. Further cases involving $48,683,-700 of the total still pending at the end of March had been disposed of except for determination of the exact dollar amounts.
   "The decrease in the pipeline company rate case load resulted principally from the Commission's 5½-month-old program of encouraging settlements of rate increase proceedings. Through this vigorous program, the Commission has avoided long and expensive hearings, and excessive rates previously collected by the pipeline companies have been promptly refunded."
   We have had occasion recently to take notice of the almost insuperable tasks facing the Commission and its overburdened staff in H. L. Hunt et al. v. F. P. C., 5 Cir., 1962, 306 F.2d 334, note 15.
   The Commission in its order of September 11, 1958, sounded almost a note of despair in describing the interminable nature of the very proceedings involved here.
   "As noted above, the first of these proceedings was initiated nearly ten years

legal mind, or its artificer, has not yet progressed to the point of perfection in draftsmanship to eliminate controversy over a contract settling a controversy, one sure way to discourage voluntary settlements is for the Commission, at the behest of one party or the other, or the ubiquitous intervenors, to read into contracts things which are simply not expressed or not there, out of the thoroughly commendable (and understandable) feeling that unless that is done the result is not as good as it ought to have been. This is particularly true in this area where, as was the case here, the proposed settlement is subjected, as it should be, to the closest scrutiny by the Commission and its staff. It is more than arms' length. Overreaching is an impossibility. But precision is not merely a possibility. Precision is almost a certainty as skilled partisans undertake to hammer out the bargain under the ever-present watchful eye (and hand) of the independent agency as the guardian of the public interest. Consequently, both in its substantive provisions and in the terminology sought to memorialize the undertaking, the parties ought to be able to accept the contract as drafted, executed and approved. It should stand for what it says.

Here the problem is precisely that: when the parties[3] said Docket G–2019, did they mean G–2019? Did they mean G–2019 plus G–1142? Or did they mean, as the Commission now says they did, not only G–2019 *and* G–1142, but "any and all rate reductions resulting from United's [the supplier's] rate proceedings"?[4]

---

ago; the second, nearly six years ago. Four years ago by our opinion No. 277, issued November 2, 1954, we approved a settlement of the seven proceedings mentioned above as to all of United's customers, except as to Mississippi * * *." And see note 35, infra, where it discusses the factors in the choice of voluntary settlement versus adversary adjudication to the bitter end.

3. The parties are identified as follows:
Texas Eastern: Texas Eastern Transmission Corporation

## Texas Eastern Dkt. G–1964

On May 1, 1952, Texas Eastern filed a § 4(e) proposal for rate increases totaling approximately $42 million annually. This rate increase was suspended until November 1, 1952. The requested increase was based on the imminent increase in the cost of purchased gas. In the initial hearings in August 1952, the evidence of Texas Eastern showed that part was predicated on increased cost of gas delivered to it by United at Longview, Texas. United was also seeking a § 4(e) increase in rates in Dkt. G–2019. This proceeding and its identifying number is of crucial importance in this case. The evidence and statements also showed a likely increase in the cost of purchased gas as a result of purchases commencing July 1, 1952 from United at Kosciusko, Mississippi. The gas purchased at Kosciusko is also of crucial importance. During these hearings an interim settlement, agreed to by Texas Eastern and all of its intervenor-customers and the staff counsel, was entered into and approved by the Commission by Opinion No. 239. After further hearings in August 1953, the parties agreed to a final settlement. The Commission approved this settlement by its order.[5] Approval of the agreed rate schedules was expressly conditioned. This whole controversy turns on condition 2(ii):

> "If, as a result of a final judgment in FPC Docket No. G–2019, Texas Eastern [x] receives a refund of any portion of amounts paid to United * * * for gas delivered at Longview, Texas, then Texas Eastern shall in turn promptly, and without

---

United: United Gas Pipe Line Company
Mississippi River: Mississippi River Fuel Corporation
Columbia: The Columbia Companies:
The Manufacturers Light and Heat Company
The Ohio Fuel Gas Company

4. Brief for Respondent, p. 13.

5. "Order Approving Settlement and Permitting Tariff and Rate Schedules to Become Effective" in Dkt. G–1964 on October 9, 1953.

additional cost or liability to Texas Eastern, distribute among all of its firm gas customers * * * the total dollars so refunded to Texas Eastern, such distribution to be in proportion to the volume of gas purchased from Texas Eastern on a firm basis during the period over which such refund accrued; * * *. If * * * [y] United * * *, as a result of a final judgment in Docket No. G–2019, * * * places in effect tariffs providing for lower sales rates to Texas Eastern than are currently in effect as of such date, and if the amount of such reduction is sufficient to permit its reflection in the rates charged by Texas Eastern to its customers without any net loss to Texas Eastern, then Texas Eastern shall file a reduction in the commodity charge of its rates in Rate Zones C and D which will as nearly as possible be equal to the combined reduction in rates charged Texas Eastern by United Gas * *. If [z] Texas Eastern is required to make a reduction in its rates pursuant to this agreement, such reduction, to the extent that it became necessary as a result of a final judgment in Docket No. G–2019, shall be made effective as of the date of such final judgment, * * *."

### United's Dkt. G–2019

On July 3, 1952, United had filed a conversion tariff [6] which included an application for § 4(e) rate increase for gas sold and delivered at Longview, Texas. On August 1, 1952, such rate increases were suspended by Commission order until January 3, 1953. United's proposed increase related to Longview only. The conversion tariff included a restatement of its rate schedule for sales to Texas Eastern at Kosciusko, Mississippi. But no change was proposed in this rate, and the Commission's order of August 1, 1952, made this rate schedule effective as of August 3, 1952. The Kosciusko rate was therefore firm and not subject to revision in G–2019. The Order did, however, take cognizance of the pendency of another distinct proceeding, United Docket G–1142.[7]

### United's Docket G–1142

Almost four years previously the Commission on October 12, 1948, had instituted a § 5(a) investigation of all of United's rates. This was Docket No. G–1142. By Order dated November 25, 1952, the Commission consolidated G–1142 and G–2019 together with other pending dockets of United "for purposes of hearing." [8]

### Proceedings in United's Dkts. G–1142 and G–2019 Consolidated

While the proceedings were consolidated "for purposes of hearing" each retained its characteristic identity for substantive action. Thus, on January 14, 1953, the Commission by an order bearing solely "Docket No. G–2019" allowed the rates (previously suspended August 1, 1952) to go into effect subject to refund by United under a corporate surety bond. No reference of any kind was made in that order to G–1142.[9] On November 2, 1954, the Commission issued

---

6. This was in compliance with Commission Order No. 114, 13 Fed.Reg. 6371, requiring that all rate schedules which then existed in the form of individually negotiated contracts between pipeline and purchaser be restated in the form of "tariff and service agreements."

7. The Order in G–2019 provided:
   "(E) This order is without prejudice to any finding or orders which have been or may hereafter be made by this Commission in Docket No. G–1142 * * *, and in any proceeding now pending, or hereafter instituted, by or against United Gas Pipe Line Company."

8. In the preliminary finding the Commission Order stated: "It appears desirable to consolidate the rate investigation * * * Docket No. G–1142 * * * with the suspension proceedings at Docket Nos. G–2019 and G–2074 so that issues * * * may be heard together." The Order expressly provided that the proceedings "are consolidated for purposes of hearing" and carefully distinguished between the proceedings.

9. So far as our record reveals, no other order was issued between this date and October 9, 1953, the date on which the settlement agreement order in G–1964,

an order in consolidated Docket Nos. G–1142, G–2019.[10] This opinion and order likewise was an approval of a settlement between United and all of its customers except Mississippi River. United was directed to file new rate schedules incorporating the settlement rates which were agreed to be effective as of August 1, 1954. United was also directed to make refunds of rates subject to § 4(e) proceedings. United's refund to Texas Eastern for Longview deliveries totaled $385,569.[11]

The existing pre-August 1, 1954, non-suspended rates for Kosciusko deliveries were also reduced. It is this reduction which is at the center of our controversy. It simplifies matters by pointing out now that there are two serious questions. First, was this a reduction by United "as a result of a final judgment in Docket No. G–2019" [12] as condition 2(ii) stated? Second, and because of circumstances now to be stated, was any such judgment "final" as of either November 2, 1954, its date, or its stated effective date, August 1, 1954? The second question arose because Mississippi River objected to the settlement on the principal ground that it was entitled to certain "rolled in" rates from United. Consequently, the Commission directed that United's settlement rates should not be applicable to Mississippi River. Despite this undetermined phase, United, in compliance with a previous order of the Commission, filed new rate schedules on January 24, 1955, effective as of August 1, 1954. Mississippi River, after the Commission rejected its objections, appealed to the Court of Appeals for the District of Columbia. On appeal the Court of Appeals rejected that contention, but reversed and remanded the order for further proceedings on another point.[13] Subsequent to remand to the Commission, the proceedings were terminated September 11, 1958, by a settlement between Mississippi River and United in which Mississippi River accepted the rates to which everyone else had agreed in October 1954. Expressing—almost, we suspect, with a note of despair—the laudable aim that "it is in the public interest that these proceedings come to an end," [14] the Commission entered an order approving the settlement between Mississippi River and United. It also ordered that the "proceedings in Docket Nos. G–1142 and G–2019 are hereby terminated."

### United's Interim § 4 Increases
### Dkt. No. G–9547
### Dkt. No. G–10592

Meanwhile, as this was dragging on through Mississippi River's appeal ending finally in its accepting the order appealed from, United superseded the rates prescribed by G–1142 and G–2019 by filing two successive § 4 rate increases. In September 1955, United filed a proposed increase which was docketed and was suspended in G–9547. These rates became effective on April 1, 1956. There was a further increase suspended and docketed in G–10594 effective as of November 16, 1956.[15] As a matter of fact, the present controversy really centers around these intervening increases. For

referring to G–2019, was entered. The order requiring reduction in Kosciusko rates of November 2, 1954, was a year and three-quarters away.

10. In the official Reports of Commission decision Opinion 277 bears this caption:
"IN THE MATTER OF
UNITED GAS PIPE LINE COMPANY
Opinion and Order Approving Proposed Rates and Providing for Further Hearings
Docket Nos. G–1142, G–1508, G–2019, G–2074, G–2210, G–2220, and G–2378
November 2, 1954"

11. This refund is covered by element [x] in condition 2(ii).

12. See elements [y] and [z].

13. Mississippi River Fuel Corp. v. F. P. C., July 8, 1957, 102 U.S.App.D.C. 238, 252 F.2d 619, cert. denied, 355 U.S. 904, 78 S.Ct. 331, 2 L.Ed.2d 260.

14. In a footnote related to this text, the Commission stated "termination of these proceedings as to Mississippi will close out Docket Nos. G–1142 and G–2019 in their entirety. Opinion No. 277 and order issued August 13, 1958, in Docket Nos. G–1142 et al."

15. In G–9547 the proposed rate was suspended October 21, 1955 until April 1, 1956. In G–10592 the rates were sus-

by the terms of the 1958 "settlement of the settlement" proffered by Texas Eastern, which we discuss later, it has offered to refund the net reduction in United's rates to Texas Eastern relating to Kosciusko deliveries for the period August 1, 1954 to April 1, 1956,[16] but it objected to any such "refund" after April 1, 1956, at which time United's rates were increased substantially above the August 1, 1954, level.[17] So far as United and its customers—here Texas Eastern— were concerned, there could no longer be any savings or "reduction" by virtue of G–2019, for the rates prescribed in G–2019 had twice been successively superseded. This follows from the words of § 4(e) which provide that if, at the expiration of the suspension period, the § 4 hearings have not been concluded, then, on motion and order of the Commission "the proposed change of rate, * * * shall go into effect." § 4(e).

### Texas Eastern's Post G–2019 Actions

The actions subsequently taken by Texas Eastern, the subject of much discussion in the briefs, have significant relevance in several ways. First, there is the question whether its conduct puts a construction on the settlement contract contrary to its present contentions. The second, is the question of timeliness of compliance, especially as it bears on the interest problem. The third is to see just what, apart from timeliness, it tendered as compliance with the settlement agreement (and order).

While reversed in point of time, it simplifies matters to discuss first that which is last. Following the order of September 11, 1958, approving the United-Mississippi River settlement— and which, by whatever name called, put an end once and for all to everything which then was still in G–2019—the Commission instructed Texas Eastern to inform the Commission of its compliance with the terms of Condition 2(ii) of G–1964. Its reply of October 6, 1958, stated that it had now made "settlements" of the Condition 2(ii) settlement agreement with all of its customers except the Columbia companies. Correspondence with these customers from October 1958 to February 1959, filed with Texas Eastern's response, showed that while it had consistently maintained that its maximum refund obligation under 2(ii) was the sum of $385,569 received from United in G–2019,[18] some customers contended they were entitled to greater refunds. Consequently, the report continued, Texas Eastern refunded or tendered to all customers, including the Columbia Companies:

| [a] | [b] | [c] |
|---|---|---|
| The sum of $385,569 | The additional sum of $2,379,035 representing savings August 1, 1954 to April 1, 1956 [19] | An added sum of $1,097,967.33 in lieu further future refunds, if any, in G–9547 or G–10592 for period April 1, 1956 to Nov. 10, 1957 [20] |

---

pended June 15, 1956 until November 16, 1956.

Texas Eastern states that the net increase in United's rates to Texas Eastern for the period April 1, 1956, to November 10, 1957, totaled $8,608,214.

16. This amounts to $2,379,035.

17. Texas Eastern states that if United had not increased its rates on April 1, 1956,

and November 16, 1956, the amount of reduction to Texas Eastern for the period April 1, 1956 to November 10, 1957, would have been $2,295,769.

18. See note 11, supra and related text.

19. See note 16, supra and related text.

20. As of this date, final action had not been taken in G–9547 or G–10592 concerning the successive § 4 increases. These cus-

The Commission's order impliedly concurs in elements [a] and [b], but it does directly treat with [c]. But the effect of its order demonstrates that a sharp difference exists to this period of time between April 1, 1956 and November 10, 1957.[21] This "sharp difference" was, however, slow in being registered or disclosed since the Commission took no formal action on Texas Eastern's last compliance report of February 23, 1959, until the letter order of March 13, 1961, now under review.[22]

Whatever its sufficiency or its timeliness, this was the first tender of compliance by Texas Eastern. Up to October 1958 it had maintained that compliance was not yet required. It is this exchange of reports, correspondence, inquiries and a motion to amend which serves as the basis for the Commission's arguments that this conduct put a construction on condition 2(ii) contrary to that presently asserted.

The Commission's opinion No. 277, issued November 2, 1954, in G-1142,

G-2019 made the rate changes effective August 1, 1954. United thereafter filed its reduced rate. But on February 23, 1955, Texas Eastern advised the Commission and its customers of its legal counsel's opinion[23] that the order entered in G-2019 was not "a final judgment" in view of Mississippi River's unwillingness to accept the settlement, and its further proceedings pending before the Commission terminating in the reversal and remand by the Court of Appeals.[24] Texas Eastern concluded that "until such time as a final judgment is rendered in Docket No. G-2019" it would set up certain reserves but "we will make no refunds to customers, nor reduce filed rates." The Commission by letter of March 14, 1955, rejected this. It stated, "The opinion of counsel upon which you base your decision rests solely upon the conclusion that Opinion No. 277 is not a final judgment as to you. This conclusion is incorrect. Opinion No. 277 is a final order and determination as to all matters presented and issues involved

tomers preferred this lump sum cash figure over Texas Eastern's previous offer to make additional refunds of the amount by which United's rate for the period from August 1, 1956, to November 10, 1957, might be reduced below its pre-August 1, 1954, rate level as a result of the final judgments in G-9547 and G-10592.

21. The Commission's letter order of March 13, 1961, presently under review directed Texas Eastern "to refund (1) the $385,-569 refund received from United and (2) a refund for the period August 1, 1954 to November 10, 1957 equivalent to the net rate reduction received from United in consolidated Docket Nos. G-1142, G-2019 * * * with interest * * * at 6% * * *."

22. This inactivity was justifiable, the Commission says, because of Mississippi River's appeal from the "settlement of the settlement," ending in the decision of the Court of Appeals in Mississippi River Fuel Corp. v. F. P. C., 1960, 108 U.S. App.D.C. 284, 281 F.2d 919, cert. den. 365 U.S. 827, 81 S.Ct. 712, 5 L.Ed.2d 705. Of course, as we discuss later, the Commission considers inactivity by Texas Eastern unjustifiable during the first Mis-

sissippi River appeal ending in the decision of Mississippi River Fuel Corp. v. F. P. C., 1957, 102 U.S.App.D.C. 238, 252 F.2d 619.

23. Counsel's opinion did not undertake to construe Condition 2(ii). The opinion was in response to a request "as to what action you [Texas Eastern] should take in order to protect yourself in the event of a subsequent reversal of Opinion No. 277 * * *, or in the event that upon rendition of a final judgment it should be determined that you are required, pursuant to provisions of the G-1964 order [Condition 2(ii)] to refund cash or reduce your rates to your customers." It then went on to speak in terms of "the maximum obligation which Texas Eastern could incur." This portion concluded with the caveat, "we emphasize that this is the maximum *possible* liability of Texas Eastern and that this statement by no means should be considered an an opinion that Texas Eastern is or will be liable to that extent to any party or parties." (Emphasis in the original.)

24. Mississippi River Fuel Corp. v. F. P. C., 1957, 102 U.S.App.D.C. 238, 252 F.2d 619.

in Docket No. G–2019, except as to the claimed rights of Mississippi River * * *." Consequently, the Commission concluded, Texas Eastern was "expected to comply with the express terms of * * * (2) (ii) * * * without delay, insofar as it requires [25] you to distribute promptly refunds paid to you by United and to reduce your rates and charges as a result of the reduced rates and charges filed by United."

There was further correspondence and conferences resulting in a lengthy letter of July 8, 1955, reiterating Texas Eastern's refusal to make immediate rate reductions. This letter the Commission now regards as of crucial importance because of the statement contained in it that Texas Eastern had "sought to make it entirely clear that it had no quarrel with the requirements of Finding (2) (ii), and that its only area of disagreement with the Commission was as to the time when the Company should be required to take action." [26]

Compliance by Texas Eastern being postponed pending a "final" judgment in

G–2019 time rolled on. In the meantime, United, which could wait neither for time nor tide, faced with increased costs filed its rate increases in September 1955 in G–9547 (see note 15, supra). This precipitated the motion of Texas Eastern October 14, 1955, to amend Condition (2) (ii) because United has now "filed new rate schedules reflecting an increase in its rates to Texas Eastern for sales of gas for Longview, Texas, and Kosciusko, Mississippi, to become effective November 1, 1955." [27] This proposal was contested by various customers and by formal motion of Texas Eastern leave was given to withdraw it, February 26, 1956. Though incompleted, unaccepted, and subsequently withdrawn, the Commission asserts that its terminology likewise committed Texas Eastern to a construction which included rate reductions at Kosciusko within G–2019 rather, than as now contended in G–1142. [28]

There it ended until September 25, 1958 when the activities previously described commenced and which led to Texas Eastern's [a] [b] [c] compliance "settlement" of February 23, 1959. [29]

25. The letter did not undertake to declare what rate reduction came within the phrase "insofar as it requires" or the earlier reference in the letter to Condition 2(ii) that it "also provides for the reduction, under specified conditions of certain of your rates * * *."

26. As Texas Eastern urges that the full context does not purport to construe Condition 2(ii) or, worse, constitute an acquiescence in the Commission's present construction of that Condition, we set out the full excerpt:
"At such conference the Company representatives emphasized that it had every intention of complying with the express provisions of the above cited finding [Condition 2(ii)] and would comply with the same as soon as practicable after the Order became final in Docket G–2019. The Company sought to make it entirely clear that it had no quarrel with the requirements of Finding (2) (ii), and that its only area of disagreement with the Commission was as to the time when the Company should be required to take action. * * *"

27. As proposed, the amended order provided that Texas Eastern should "refund to

its customers * * * the actual difference between the cost of gas purchased from United at Longview, Texas, and Kosciusko, Mississippi, under rates effective: (i) prior to August 1, 1954 and (ii) on and after August 1, 1954, for the period from August 1, 1954, to the effective date" of United's rate increases in G–9547.

28. The Commission especially emphasizes this language in the proposed Amendment:
"By its opinion No. 277 * * * in Docket No. G–2019, the Commission ordered United to file * * * new rates for sales of gas by United to Texas Eastern at Longview, Texas, and at Kosciusko, Mississippi; * * *. Pursuant to said Order, United filed rates * * * increasing its rate for sales of gas * * * at Longview, Texas, and decreasing its rate for sale * * * at Kosciusko, Mississippi. * * *." Then followed a reference to Texas Eastern's running controversy over the finality of the judgment in G–2019.

29. See notes 19, 20 and related text.

*Reference to Docket G–2019
was Purposeful*

While our conclusion that reference to Docket G–2019 was purposeful and did not thereby include actions taken in G–1142 and this decision is reached on the face of the document itself, we have nevertheless undertaken to set forth this great detail. We have done this because of the earnest argument made by the parties and the desirability of putting in proper context the evidence thought by the Commission to demonstrate a contrary construction of Condition 2(ii). This historical detail also makes it possible for us to list more briefly some of the factors leading to this basic conclusion.

In arriving at this conclusion, we have borne in mind what we emphasized at the outset that this was a *contract*. Being a contract, it was important that the parties know what was being surrendered, what was being gained. This was of importance to everyone, and certainly to Texas Eastern. Its proposed rates called for an increase of approximately $44 million annually. Out of the settlement, this increase was reduced by $15 million. And it was subject to further reduction by the operation of Condition 2(ii). It was essential therefore that with the inescapable uncertainty of the time and amount of such further reductions, Texas Eastern know precisely the standard upon which they were to be determined. Here the parties supplied that standard by a sort of shorthand symbol "the final judgment in Docket G–2019."

Several things stand out to support the conclusion that reference to G–2019 was purposely limited to that proceeding only. The order of consolidation in G–1142 and G–2019 (and others) was entered November 1952. Nevertheless the Commission was itself scrupulously precise in distinguishing between the proceedings. Thus its subsequent order of January 14, 1953 (note 9, supra) allowing United rates to go into effect under bond was headed "Docket G–2019" with no reference to G–1142 or to the Docket Nos. as consolidated. Likewise, in a related proceeding involving the controversy between Mississippi River and United, the parties carefully distinguished the obligation to file reduced rates from that of passing on cash refunds received. The parties then spelled out the inclusion of both G–1142 and G–2019.[30] True, there were different parties, and different scriveners, but some parties were the same, the subject was identical, and always there was the energetic staff of the Commission whose protection of the public interest required, as a minimum, that it exact precision as the price of its concurrence.

The notion that reference to G–2019 casually brought any and all other dockets to which United might be a party into the scope of this indeterminable refund-rate-reduction-obligation ignores the technical, but profound, distinction between the nature of a § 4 and a § 5 proceeding. United Gas Pipe Line Co. v. Mobile Gas Service Corp., 1956, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373; F. P. C. v. Sierra Pacific Power Co., 1956, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388. Since United's conversion tariff covering Kosciusko rates did not make an increase, the parties—all of whom were represented by seasoned hands skilled in the Natural Gas Act—knew positively that the Commission in the § 4(e) proceedings in G–2019 did not have the power, nor did they ever undertake to, alter such rates. The downward changes in that rate could come about only by the Commission § 5(a) general

---

30. Article VII provided:
"If United * * * is required by any final order or orders of the Commission * * * in the proceedings in Commission Docket Nos. G–1142 *and* G–2019, *or either of them,* to make any reduction in the rates to be charged * * * then Mississippi * * * shall file * * *

changes * * * to reduce the rates * * *." (Emphasis added.)

This settlement is the subject of the opinion in Mississippi River Fuel Corp. v. F. P. C., 1960, 108 U.S.App.D.C. 284, 281 F.2d 919, and paragraph VII is quoted at p. 924.

investigation which, all knew equally well, had been pending since 1948 in G–1142.

The Commission certainly respected the distinction between these proceedings. In Opinion No. 277, it did not undertake to throw everything in under a single catch-all docket reference number. The docket numbers were separately listed.[31] Indeed, this was more than good procedural administrative housekeeping. It was substantively indispensable. The cases thrown into the hopper were related in many ways. But they were also quite distinct. Consequently, no matter how the common order or opinion might be headed by a clerical docket number, it was positive that in an operative sense, everything had to go back to the particular proceeding out of which the specific problem arose. It was this very approach that led the Commission—and properly so—to rule that, whatever the scope and meaning of it, the order of Opinion No. 277 was "final" as to Texas Eastern on November 2, 1954. As to Texas Eastern, vis-a-vis United, it was not jeopardized or made uncertain by Mississippi River's appeal.[32]

What the Commission was required to—and did—keep distinctly separate, the parties were likewise entitled to treat both as separate and as indicating nothing more than the particular specified separate proceeding.

To demonstrate that reference to G–2019 meant something else, the Commission (and intervenors) assert several things. One is that since Kosciusko rates were included in the conversion tariff, part of which was suspended and set down for hearing in G–2019, the reference to G–2019 reflected the parties'

awareness that the Kosciusko rates might be lowered. But as we have pointed out, this could not be done in G–2019. If it was to be done at all, it had to be done under § 5(a) and that was the subject of G–1142. Next, as a sort of corollary to this, it is urged that in determining the lawfulness of the Longview (Central Zone) rates in G–2019, the parties knew that the Commission, viewing United's operations comprehensively, might well have to evaluate Kosciusko rates also. Whatever interrelationship there might be, the reduction would certainly not fit the words of Condition 2(ii) that "If * * * United * * *, as a result of a final judgment in Docket No. G–2019 * * places in effect tariffs providing for lower sales rate * * *." Of course, nothing like this took place for opinion No. 277 reflects that the reduction in Kosciusko was by virtue of the unquestioned power of the Commission in the § 5(a) proceedings in G–1142. It did not undertake to do this by any tail-wagging process now urged.

That brings us to the most substantial argument which, stated in various ways, asserts that G–2019 must include G–1142 because any other construction imputes to the parties action which simply does not make sense. Reversing it, the Commission's brief urges that the only "common sense result" which the parties could have intended is one in which Texas Eastern would "pass on to its customers the full benefit of the refund and rate reductions ordered in the pending consolidated proceedings." What underlays this argument is the further assertion that the construction advanced by Texas Eastern means that its "customers acquiesced in the distinct possibility of a future windfall to Texas Eastern."

---

31. See note 10, supra.

32. In the order of September 11, 1958, approving the Mississippi-United settlement after remand (252 F.2d 622), the Commission's purpose to keep each one of the consolidated dockets separate for substantive purposes was reflected at note 2:

"The order which the Court reviewed fixed the rate for the only customer for whom rates had not been previously fixed in *seven proceedings* relating to United's jurisdictional sales. United Gas Pipe Line Co., Opinion No. 277, Docket Nos. G–1142, G–1508, G–2019, G–2074, G–2210, G–2220, and G–2378, issued November 2, 1954." (Emphasis added.)

Putting it another way, it is inconceivable that "the parties would have intended to have Texas Eastern pass on any prospective reduction in United's [Longview] Zone rates but leave it free to enjoy a windfall upon United's reduction of its [Kosciusko] Zone rates." The Commission points out that Texas Eastern's proposed increases were, in turn, based on two things. First was the increased cost for gas purchased at Longview. Second, and for a substantial amount, was the cost of gas—but not a proposed increase in the cost of such gas—to be purchased at Kosciusko at rates then currently in effect. Consequently, the Commission's brief asserts, since the Commission some five years before in 1948, had initiated a proceeding under § 5(a) questioning the lawfulness of United's rates in all Zones "there was the distinct possibility that that proceeding would eventuate in an order for prospective reductions in the [Kosciusko] Zone." Next, the Commission argues, that whereas in the event of an *increase* in United's rates under the § 5(a) order, Texas Eastern could protect itself by immediate § 4 filings for increased rates subject only to five months' suspension, the customers of Texas Eastern could be protected against the possibility of a rate reduction only by suitable condition in the Texas Eastern settlement. Otherwise, the argument runs, upon a reduction in United's rates (by the § 5(a) proceedings in G–1142), the Commission could do no more than institute another § 5(a) investigation into Texas Eastern's rates; and, after hearing, order only prospective rate reduction, "thus affording a windfall to Texas Eastern in the interim."

We think that effective arguments of equal strength could readily be marshalled against these. Thus, for example, assuming that the parties knew that in a proceeding which had been percolating since 1948, "there was a distinct possibility" that reductions in United's rates would be ordered the parties knew equally well that that could not come about in G–2019 as such. Likewise, the specter of a windfall never materialized. In the 1958 tender made to, and accepted by, all of the customers save the Columbia companies, element [b], see note 19, supra, gives them the full benefit of actual reductions in Kosciusko rates even though such funds were not legally due.[33]

But we think that any such analysis, pro or con, is fundamentally erroneous. Of course, like many situations in the law, a factor, actually and finally extraneous, is brought in as a sort of a negative-tester.[34] Consequently, it is entirely appropriate that the briefs have discussed these factors. But great care must be used lest this obscure what is so basic and crucial here—we are dealing with a settlement.

33. As to the period from April 1, 1956 to November 10, 1957, covered in part by element [c] (see note 20, supra), on no stretch of the imagination can it be said that Texas Eastern has received the benefit of any "reductions" as "a result of the final judgment in Docket No. G–2019." Assuming that G–2019 incorporated § 5 (a) reductions of G–1142, they cease to be reductions received *by virtue* of such consolidated orders when and as United filed its rate increases in G–9547, and later on in G–10592. As between Texas Eastern and its customers, this was not, as the Circuit Court for the District of Columbia seemed to reason, a situation in which Texas Eastern was attempting to obtain an increase in rates without complying with the § 4 procedure. What, and all that, is involved is the construction of a settlement contract by which, at most, the customers of Texas Eastern seek to obtain the benefit of any actual lowered costs to Texas Eastern in the purchase of its gas from United. When the costs were no longer lowered, then by reason of the terms of the settlement contract there was no longer any obligation to "pass" them on. Were the matter before us for decision, we would therefore have considerable difficulty in accepting this approach and conclusion of Mississippi River Fuel Corporation v. F. P. C., 1960, 108 U.S.App.D.C. 284, 281 F.2d 919.

34. E. g., the determination of antiunion motivation for a discharge in violation of § 8(a) (3) of the Labor Management Relations Act, 29 U.S.C.A. § 158(a) (3); N. L. R. B. v. McGahey, 5 Cir., 1956, 233 F.2d 406, 413.

The approach of the Commission is that the settlement necessarily had to provide everything—including safeguards against every unknown, but possible contingency—which a final order after an adversary proceeding would have included. This is but to say that the settlement agreement would never have been made unless it was legally perfect and all sufficient, and therefore it must be construed to accomplish that objective. But that is not a settlement. That is acquiescence in an adversary order under circumstances which merely abandons further procedural processes.

■ A settlement by its very nature is a compromise—a process by which positions, legal or factual, no matter how seriously maintained or legally supportable, are surrendered in whole or in part to achieve peace. If it is to be really a settlement, the parties will have weighed, consciously or unconsciously, the relative importance of subsidiary factors. Each party must give. How much to give is a matter for each party. Seldom will it ever be possible to determine retrospectively what the other would have done had the adversary insisted upon a different term in the compromise. It is only certain that it is not sound to test that in terms of what each "legally" had to do, or had the right to expect the other to do. Florida Trailer and Equipment Co. v. Deal, 5 Cir., 1960, 284 F.2d 567. Indeed, the very purpose of the settlement is to make adjudication of these intricate problems unnecessary as the Commission itself has recognized.[35]

Many arguments can be mustered why either one of the parties would not have agreed to this settlement were it now to receive the construction urged by the other. The simple truth is that we can never know. Texas Eastern, for example, was willing to "give up" $15 million of its proposed increases. The Commission on the other hand was willing to "give up" its legal right to contest further the increase of $27 million thus agreed to. A factor was the extent of further refunds or reductions depending on developments in one or more proceedings outside of this one. Just as there was bound to have been compromise and adjustment in the process of "giving up" $15 million and in "giving into" $27 million, there was likewise a basis for adjustment in the nature, extent and scope of such future contingent refunds or rate reductions. The parties used a symbol having a definitive precise meaning. We cannot ignore it by thinking now that it might have been a bad trade.

■ In view of this little need be said about the further point that conduct by Texas Eastern put a construction on it so much at variance with its present contentions as to conclusively show the proper reading of it. Though we freely acknowledge that, here and there, words and phrases may be found in the exchange of correspondence, motions, replies and oppositions, the actual conduct of Texas Eastern is consistent with but one thing. It was insisting that opinion No. 277 was not final until the conclusion of the Mississippi River-United settlement. That is what they were debating in the exchange. And in none of it did Texas Eastern ever take a position showing what its liabilities under Condition 2(ii) would be when, and as, the proper time was reached. So far as the 1955 petition to amend[36] Condition 2(ii) and

35. In the order of September 11, 1958, approving the Mississippi River-United settlement, see notes 2, 14, and 32, the Commission described the process:

"The sole issue now before us then is whether, under the circumstances present here, we should approve the proposed settlement notwithstanding the possibility that if these matters proceeded to final conclusion (that is to say, if United's case was cross-examined; other parties presented testimony, their cases cross-examined: United presented rebuttal evidence and that cross-examined; the matters briefed, examiner's decision rendered, exceptions filed, oral argument had upon exceptions, and the whole band of the administrative process as provided for in the Act and the Administrative Procedure Act followed), we might then arrive at a determination that United should be allowed in a cost of service something less than $14,152,326 for its purchase from Union."

36. See notes 27 and 28, supra.

its subsequent formal withdrawal is concerned, we do not see how action proposing an amendment which was never completed and later was withdrawn can amount to anything more than another earnest effort to find a practical solution to a problem which had been plaguing all of the parties—as it still does. The proposed amendment was an effort to cure in advance the further controversy engendered because of the subsequent increases in United's rates. It was to meet a situation not existing or presumably contemplated at the time of the initial settlement agreement in G–1964. As to this we have seen that even at this late date there is, or may well be, a considerable basis for a difference of opinion. See note 33, supra. As such, it was another settlement or a settlement proposal. That brings into play all of the intrinsic countervailing factors which inhere in the process of making a compromise. Evidence of offers of compromise is ordinarily not admissible at all. And an offer to "settle a settlement" is so fraught with uncertainties that it is scarcely a reliable basis upon which to find conclusively that when G–2019 was articulately used by knowledgable parties, they nevertheless intended that "Texas Eastern should pass on to its customers the full benefit of the refund and rate reductions ordered in the pending consolidated proceedings" no matter what their docket number, no matter what their date of origin, and no matter what their geographical application.

■ The result is that we agree with Texas Eastern that its refund and rate reduction obligations are restricted to those directly set in motion by G–2019 and that, conversely, they do not encompass the rate reductions for gas delivered at Kosciusko as a result of reductions brought about by the § 5(a) proceedings in G–1142.

### G–2019 Final in 1954

■ While it does not appear to have any particualr significance except perhaps as to the interest element, we think the Commission is certainly correct in its decision that with respect to the United-Texas Eastern rates, opinion No. 277 became final in November 1954. To be sure, there was a controversy yet remaining as between Mississippi River and United, but these in no way related to Texas Eastern or the rates to be charged for gas sold to it by United. The objections urged by Mississippi River related to its own rates. Nothing which the Commission would do with respect to that controversy, or a court would do on appeal from it, either did, or could, have had any practical effect upon the rates previously approved in November 1954 as between United and Texas Eastern. Certainly United treated it as final by making refunds (see note 11, supra), and putting into effect the reduced rates for Kosciusko sales (see note 19, supra).

### G–2019 Effective August 1, 1954

■ Likewise, we agree with the Commission that the obligation to make refund while imposed by the order of November 2, 1954, was properly made effective as of August 1, 1954. This was certainly a contingency within the terms of Condition 2(ii). It provided that "such reduction * * * as a result of the final judgment in Docket No. G–2019," shall be made effective as of the date of such final judgment. It is not to be so narrowly read as to limit it to the actual day upon which the order was entered. The "effective date" is the day on which the judgment in G–2019 is to take effect. Since this Condition 2(ii) was in a settlement made in G–1964, the parties certainly had to contemplate that G–2019 might likewise terminate in a settlement. That exposed them to the likelihood that the parties to such a settlement would stipulate, with Commission approval, to a retroactive effective date. This construction carries out, no more and no less, the purpose to assure that Texas Eastern would pass on to its customers all of the benefits from rate reductions or refunds as a result of the judgment in G–2019. If United agreed, as it did, to make the rates ef-

fective as of a prior date, then Texas Eastern, to the extent it received such refunds or reductions, agreed to pass them on to its customers.

#### Interest

That leaves then only the question of interest. The Commission letter order determined that "Texas Eastern's failure to make prompt refunds and rate reductions" requires the imposition of an obligation to pay interest "at 6% per annum on all refunds from the date of receipt of * * * excess amounts to the date of refund."

We find it unnecessary to discuss this at any length. In the Mississippi-River United settlement, the Court imposed interest even though the settlement contract did not provide for it.[37] Here Texas Eastern urges that the phrase in Condition 2(ii) requiring that refunds received from United should be distributed promptly "and without additional cost or liability to Texas Eastern" excludes the obligation to pay interest. We do not examine this closely either.

Considerable latitude must be left to the Commission as a sanction to insure prompt compliance with obligations imposed under Orders of agreed settlements. Here we think, however, that on our ultimate conclusion the matter is virtually moot. The amounts paid to all of the customers other than the Columbia companies included element [b] and [c]. These were payments of substantial amounts over and beyond that legally required under the settlement agreement since all that Texas Eastern had to refund was the cash refund received under element [a]. The payment of sums substantially in excess of the amount legally due, and greatly in excess of any interest then due, or since accrued, more than compensates those customers for the loss of the use of money rightfully due them shortly after November 1954.

So far as concerns the intervenor Columbia companies, our holding would be the same to the extent that they are now free to accept, as did all others, the tender covering elements [b] and [c]. To the extent that by their refusal to accept the tender, they have now lost the opportunity of receiving like payments for elements [b] and [c], we would consider that for refunds of element [a], the Commission had ample basis for awarding 6% interest on those amounts. As the record is unclear as to this phase and calculations in any event would be required, the cause is remanded to the Commission as to this.

The result is that, except for the limited factor of interest, the letter order of the Commission is reversed, and the matter is remanded to the Commission for such further and other proceedings as are consistent with this opinion.

Reversed and remanded.

---

37. Mississippi River Fuel Corp. v. F. P. C., 1960, 108 U.S.App.D.C. 284, 281 F.2d 919, at 927.