MISSISSIPPI RIVER FUEL CORPORA-
TION, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

United Gas Pipe Line Company,
Intervenor.

No. 13199.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 4, 1957.

Decided July 8, 1957.

Petition for Rehearing Denied
Sept. 19, 1957.

Writ of Certiorari Denied Dec. 16, 1957.
See 78 S.Ct. 331.

Mr. William A. Dougherty, New York City, with whom Mr. Henry F. Lippitt, II, New York City, was on the brief, for petitioner.

Mr. Louis L. DaPra, Atty., F. P. C., of the bar of the Supreme Court of Indiana, pro hac vice, by special leave of Court, with whom Mr. Willard W. Gatchell, Gen. Counsel, F. P. C., and Mr. Howard E. Wahrenbrock, Asst. Gen. Counsel, F. P. C., were on the brief, for respondent.

Mr. Thomas Fletcher, of the bar of the Supreme Court of Texas, Houston, Tex., pro hac vice, by special leave of Court, with whom Mr. C. Huffman Lewis, Shreveport, La., was on the brief, for intervenor. Mr. Morton E. Yohalem, Washington, D. C., also entered an appearance for intervenor.

Before PRETTYMAN, BAZELON and BURGER, Circuit Judges.

PRETTYMAN, Circuit Judge.

This is a petition to review an order of the Federal Power Commission. Two companies are involved. United Gas Pipe Line Company, which we shall call "United", is a natural gas company operating a large natural gas transmission system. It is the vendor of the gas with which we are concerned. Mississippi River Fuel Corporation, which we shall call "Mississippi", is also a natural gas company operating a transmission system. It buys from United.

Mississippi and United had two contracts. One was made in 1929. It originally provided for the sale and purchase of gas from certain designated fields at certain designated prices and contained

certain other provisions which we will discuss later. It was amended from time to time until 1949. The other contract was made in 1951. It was premised upon the construction of new pipe-line facilities by United. It obligated Mississippi to a specified demand per day and established a price different from that in the old contract.

The proceeding before the Commission began in 1948 as an investigation into the rates and charges of United. The Commission ordered United to file a restatement of its rates in a "conversion tariff", and United did so. Hearings were held from time to time, and in 1954 all parties except Mississippi and another agreed to a compromise settlement. Further hearings were ordered and held concerning the issues raised by Mississippi. They culminated in November, 1955, in the order here under review.

Generally speaking, the features of the order which are attacked by Mississippi are: (1) The Commission allowed as a cost of service the full prices paid for gas by United to an affiliate wholly owned by a common parent;[1] (2) the Commission approved a rolled-in form of rate for sales to Mississippi, ignoring the prior contract commitments and the widely different costs incurred in supplying those commitments; (3) the Commission abrogated a 1945 purchase agreement (a supplement to the 1929 contract) between United and Mississippi by omitting a provision requiring United to supply such quantities of gas as Mississippi might nominate by 1961 and by inserting a minimum take-or-pay provision; and (4) the Commission directed United to file a rate schedule containing rates higher than the 1929 contract rate then on file.[2] We shall discuss these points in order.

## I

United has an affiliate, the Union Producing Company, wholly owned by their common parent. United bought in 1953, the test year, approximately 20 per cent of its gas from Union. The price was self-determined by the related companies without regulatory restriction. No cost data was submitted. In fixing the rates to be paid United by Mississippi, the Commission included the price paid Union by United as part of the cost of service.

Mississippi says the Commission erred, in that the prices paid Union were dependent only "upon the subjective feeling of United's management" and no measurement was made in this proceeding by any "objective standards". It cites a number of authorities, particularly Western Distributing Co. v. Public Service Comm.[3]

The Commission says that, while it is empowered to inquire into United's contract prices, it was not required to do so and its action here was a reasonable exercise of administrative discretion. To have done otherwise, it says, would have meant a full-blown rate case against Union, vastly enlarging an already large and long-pending proceeding.

The gas sold United by Union came from some 592 wholly-owned wells and 365 partially-owned wells in numerous fields. It was bought under more than 300 contracts. What the examiner did was to compare the prices United paid to Union with the prices United paid to non-affiliated producers. He concluded that the weighted average price paid by United to its non-affiliated producers is substantially more than the weighted price paid Union by United. Thus, he said, the evidence showed that United-Union prices, judged by these objective

1. The petitioner's application for rehearing specifically included this point. We do not read Federal Power Comm. v. Colorado Interstate Gas Co., 348 U.S. 492, 75 S.Ct. 467, 99 L.Ed. 583 (1955), as requiring that the application for rehearing cite every case relied upon before the Court of Appeals.

2. An increase over the original 1929 rate became effective, subject to refund, on January 3, 1953, pursuant to an interim tariff filing by United.

3. 285 U.S. 119, 52 S.Ct. 283, 76 L.Ed. 655 (1932).

standards, were not above a level conceded by Mississippi to be fair, just and reasonable for others. His conclusions were adopted by the Commission and held to be a sufficient basis for including the prices paid Union as part of United's cost of service.

The Commission stresses the inadvisability of a full-blown inquiry into Union's rates as a part of this proceeding. Ordinarily regulatory agencies do not inquire' into the price structures of suppliers of goods to regulated utilities; they have a measure of duty to inquire into the reasonable fairness of the prices paid by the utility and to be allowed as costs in the determination of rates. But here the supplier (Union) and the utility (United) are corporate affiliates.

In this situation there are several important' factors not ordinarily present. The United-Union prices were not arm's-length transactions. From time to time those prices between the two affiliates were increased. At least part of the increase authorized by the Commission in United's prices to Mississippi arose from these increases in United's payments to Union. If the United-Union increases were bona fide increases in costs incurred by Union in acquiring gas, that would be one thing; but, if they were merely a device for siphoning potential profits from one affiliate to another, for transferring amounts from an advantage to customers to an advantage for stockholders, that is another thing. If the initial contracts between Union and United were fair and reasonable, the advantage thus created by their relatively low prices would belong in part at least to the customers of United; it could not be shunted by a mere intra-corporate entry into accounts available to stockholders only. A mere comparison of such prices with prevailing prices would not sufficiently justify the transactions.

The Commission's order in the case at bar was issued shortly before the opinion of this court in City of Detroit, Michigan v. Federal Power Comm.[4] There

we reviewed an order which allowed a pipe-line company to evaluate gas produced in its own wells in terms of the "fair field" or "weighted average arm's-length" price which that gas would bring on the open market if sold by the pipe-line company in the producing area and to include the resulting amount in operating expenses to be recovered through the rates. We rejected this use of the field price, because the Commission record did not show that such an allowance was reasonably necessary to serve any stated ends of the Natural Gas Act, 15 U.S.C.A. § 717 et seq. A 100 per cent affiliate stands in the same position as does the integrated producing "arm" of a pipe-line company. Under the doctrine of the City of Detroit case United could not, on the record as it is now before us, use as costs the fair field price of gas produced by its affiliate, Union; a reconsideration by the Commission under the principles laid down in that case would be necessary.

■ But United did not seek to use fair field prices; it used contract prices fixed in contracts with its affiliate, and measured the reasonableness of those contract prices by the fair field prices. From time to time the affiliated contractors increased the prices applicable to sales between them. We think the Commission could no more test the reasonableness of interaffiliate prices by the use of fair field prices (without more) than it could allow as costs the fair field prices (without more). To be included in United's costs, increases in the interaffiliate prices must have some factual economic justification. By way of extreme example, if Union's production and delivery costs remained static and it increased its prices to United, that much of the corporate-system revenues would be shunted from United to Union. If, in this example, the full new prices were allowed as costs to United, one of two results would ensue. If United's prices to its customers had been yielding no more than a fair return, those prices

4. 97 U.S.App.D.C. 260, 230 F.2d 810 (1955).

would have to be increased to compensate for the increased costs. If United's prices had been yielding more than a fair return, so that a reduction in those prices was a possibility, that reduction would be forestalled by the increase in costs. Thus, by the allowance, in our example, of the increased Union-United prices as costs of United, the amount of the increase would be shunted from a potential benefit to the corporate-system customers (direct customers of United) to a benefit to the corporate-system stockholders. To a less extent any increase in the interaffiliate prices (Union-United) not reflecting increases in Union's costs or expenses would represent a shunting of benefit from customers to stockholders. We do not say that all benefits, in total amounts, due to initial advantageous arrangements at the wells or to astute original operational arrangement belong to the customers and none to the stockholders. But we do say that the whole of such benefits, as measured by increasing fair field prices, cannot be assigned to the stockholders by unexamined increases in interaffiliate prices accepted as costs of the affiliate-purchaser. The same course of reasoning which we followed in the City of Detroit case is applicable here. Therefore we think the Commission must at least inquire into the factual justification for the price increases paid by United to Union. By this we mean that to include the increased prices in the costs of United the Commission must at least determine that the increases were justified by reason of Union's costs or by reason of some other stated end of the Natural Gas Act; the Commission must ascertain that they were not mere bookkeeping or intra-corporate-system adjustments. We must remand the case for that inquiry. We do not hold that a full-blown inquiry into the rates of Union is necessary. Subsequent developments in the proceeding may or may not indicate such a necessity.

## II

Mississippi says its contracts with United require a separate determination of rates under each contract. It says that, until the Commission determines, upon a proper record, the public interest requires abrogation of the contracts, the separate contractual basis must be maintained. This result, it says, is required by the decisions in the Mobile [5] and Sierra Pacific [6] cases.

The so-called "old contract", the one of 1929, originally named the fields from which the purchased gas was to come. It named a price, later raised until it was a forty-five-cent demand charge and a five-cent commodity charge. Amendments to the contract in 1945 and 1949 did not repeat the field designation but merely specified that the gas be transported through a designated pipe line proposed to be constructed by United from the Carthage field in Texas to a named point (Sterlington) in Louisiana. This amendment was intended by the parties, the examiner found, to assure systemwide availability of gas for Mississippi. The so-called "new contract" of 1951 did not specify the source fields of the gas to be purchased under it.

Evidence was presented to show, and the Commission found, that United's properties are integrated and interconnected and that the two lines from Sterlington to Perryville, the sole delivery point to Mississippi, were tied into all sources of supply running into the Monroe District. The Commission found that allocation to separate lines and sources of supply solely for Mississippi was not feasible, that the gas was commingled before delivery to Mississippi, and that continuance of two rates for the same service at the same point was not in the public interest and would result in unreasonable differences.

The Commission fixed a single rate of seventy-five-cent demand and ten-cent commodity charge for all sales to pipe-

5. United Gas Co. v. Mobile Gas Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956).

6. Federal Power Comm. v. Sierra Pacific Power Co., 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956).

line companies in the Central Rate Zone served from United's transmission system. The rate under the "old" contract with Mississippi had been forty-five cents and five cents and under the "new" contract a dollar and thirty cents and twelve and a half cents. The net result of the single "rolled-in" rate is computed to be an increase in rates to be paid United by Mississippi of some $1,350,000 a year [7] over pre-investigation rates.

The Commission has power under Section 5(a) of the Natural Gas Act [8] to determine a just and reasonable rate or contract affecting rates whenever it finds that an existing rate or contract affecting rates is unjust, unreasonable, unduly discriminatory, or preferential. In the case at bar the findings of the Commission were that the two rates on the separate contracts "are not in the public interest", that the continued existence of two rate schedules would constitute "maintenance of an unreasonable difference", and that compliance with Section 4 of the Act would be effected by a filing by United which would "eliminate unjust, unreasonable and unduly discriminatory rates to Mississippi" and would apply to Mississippi the same rates applicable to other customers. We think these findings adequately met the statutory prescription for underlying findings in Section 5(a).

We get the impression that Mississippi does not contest too strenuously the result of the Commission's order in dollars at this point but that the thrust of its argument is that it is entitled to the maintenance of its two contracts with separate rates rather than a single rate for all purchases. It does not specifically proclaim its disinterest in the dollar result, but it prepared and presented an exhibit which seemed to show that a seventy-five-cent demand and a nine-cent

commodity charge under the "old" contract and a dollar-and-fifteen-cent and ten-cent charge under the "new" would yield the same amounts.

Mississippi makes two principal claims of damage to it. It claims that the single rate hurts it more than it hurts other purchasers from United since a larger proportion of its purchases were under the older, lower contract rates whereas the greater part of the others' purchases were under newer, higher contract rates. Again, the commodity price in the single rate is twice that in the old contract rate, and Mississippi claims that, because rates to interruptible industrial consumers are pegged largely on the commodity rate, the doubled rate is particularly injurious to that phase of Mississippi's operations. Sales direct to industry are not regulated by the Commission, but it can influence these rates by its allocation of costs to industrial business as part of its determination of rates over which it has jurisdiction. A low commodity rate would enable Mississippi to meet competition from other fuels without jeopardizing its profits from its jurisdictional sales. These seem to be the principal reasons for Mississippi's opposition to the single rate. While they are potent from the standpoint of that company, they do not avail too much from the standpoint of general regulation and the public interest.

Mississippi argues that the Commission was required by the Mobile and Sierra Pacific cases, supra, to find specifically that the old contract rate of forty-five cents and five cents was itself unlawful before it could order it changed. Those cases each dealt with a single existing contract. The Court held that before the Commission could cause such a contract rate to be raised it must make the findings required by the statute. In

7. The Commission makes reference in its brief to an annual reduction of nearly $1,000,000. But that was computed on the basis of an increase allowed to be put into effect by United, subject to refund, during the proceeding. That tentative increase became effective January 3, 1953. It is part of the total result here under dispute.

8. 52 Stat. 823 (1938), 15 U.S.C.A. § 717d (a).

the case at bar there are two existing contracts, one with a low rate and the other with a high one. The Commission did not find specifically that the low rate was unreasonable, etc. It found that the two contracts, with two rates, were not in the public interest and would maintain an unreasonable difference. It seems to us that the action of the Commission was within the scope of the statute and within the doctrine of the Mobile and Sierra Pacific cases, even though not within the factual bases of those opinions. We think that in a situation involving two contracts, at different prices, for different portions of a single service, it is within the power of the Commission to combine the two contracts even though the combination results seemingly in a technical breach of the contractor's or the public's rights under the lower priced of the two contracts.

We think the record amply supports the Commission's conclusion that the two separate rates under the "old" and "new" contracts between United and Mississippi should give way to the single rate applicable to all customers. We affirm its order on that point.

### III

Mississippi says the Commission erred in omitting an "old" contract provision requiring United to supply it with additional quantities of gas. The amendment of 1945 to that contract provided that any time prior to May 1, 1961, Mississippi could call upon United for increased quantities of gas and thereafter United would furnish such increased amounts. In 1949 Mississippi requested United to supply 65 per cent of its requirements instead of the prior 40 per cent, and United complied. When United filed the tariff which became the basis for the Commission's present order, it omitted that clause of the contract, and the Commission approved the omission.

Mississippi says the omission is seriously prejudicial because United has always been the "backbone" of its source of supply and its right until 1961 to require United to supply its additional requirements is an integral part of its plans and a basis of reliance by its customers for an adequate supply. It says that under the Commission's regulations United could not unilaterally abrogate the clause in question.

The Commission says the clause accorded Mississippi a preferential right over all other customers of United and should therefore be eliminated. It says the omission was proper under the regulation.[9] It says that United could not possibly obligate itself to satisfy the full future requirements of Mississippi, let alone all of its customers.

The Commission further says the contract clause in question did not mean what Mississippi claims it meant but meant only that Mississippi could make one nomination of additional supply. It says this interpretation of the contract is demonstrated by Mississippi's own conduct: in 1950, when it needed more gas, it purchased from independent producers, and again in 1951, when it again needed more gas, it made a new contract with United instead of exercising the right it now says it had under the existing contract. This conduct, says the Commission, is inexplicable under Mississippi's present reading of the contract clause. Lastly, the Commission says if the clause meant what Mississippi claims it meant it would be within the plenary power of the Commission under Section 7(c) of the Act as amended.[10]

■ Without considering all the various contentions on the point, we think the clause in question, in the presence of dual contract rates, would create a discriminatory preference and therefore could properly be omitted from the approved tariff. Since we have approved the Commission's order eliminating the rate differential, the point loses much of its importance. We affirm the Commission's order on this point.

9. 18 C.F.R. § 154.85.

10. 56 Stat. 83 (1942), 15 U.S.C.A. § 717f (c).

**626**

The Commission included in United's tariff a 72 per cent minimum take-or-pay clause. This would require Mississippi to pay a commodity charge measured by 72 per cent of the maximum daily quantity. The same requirement was imposed upon all of United's customers. Mississippi's objection is that this could have a very adverse effect, "if in a depressed business condition or a bad competitive position we were unable to sell as much gas as would be required to keep that old contract at 72 percent."

We think Mississippi's fears are not sufficient basis for a differentiation between it and all other customers. We accept at full value the Commission's assurance that "if, in the future, the provision should be considered by petitioner to be, in fact, onerous to it, the Act provides relief." Upon that basis we affirm the Commission on this point.

## IV

As we have already pointed out, the rates under Mississippi's "old" contract, after the increase of January 3, 1953, were sixty-five cents demand and nine cents commodity. The over-all rate ordered by the Commission was seventy-five cents and ten cents. Mississippi says this was an increase in rates forbidden by Section 5(a) of the Act.[11] It says the Commission virtually, if not actually, ordered United to file the new schedule. Section 5(a) provides in pertinent part:

"That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; * * *."

As we have seen, while the rates authorized by the Commission were higher than those in the "old" United-Mississippi contract, they were lower than those in the "new" contract. The whole action was to substitute a single rate for two separate rates found by the Commission to be unduly preferential. The Commission had a positive duty under the basic provisions of Section 5(a) to eliminate preferential discriminations. While the dollar amount of the charges authorized by the Commission was greater than the amount of the contract rates, it was less than the dollar amount shown by the conversion tariff filed by United and effective January 3, 1953. United's tariff would have increased the charges to Mississippi by some $2,300,000. The eventual increase under the Commission's order was, as we have noted, some $1,-350,000.

We think the above-quoted proviso in Section 5(a) did not prohibit the Commission from eliminating the dual-rate structure of the two separate contracts when it found that system to be unduly preferential. Any over-all rate substitute would necessarily have to be higher than the very low rate of the "old" contract and higher even than that rate as adjusted in January, 1953. The increase in that rate was merely an essential part in the elimination of the dual-rate structure. We think it was authorized by Section 5(a) taken as a whole and as applied to the peculiar circumstances of this case. We agree with the Commission on this point.

Because of the necessity for further findings on Point I the Commission's order will be vacated and the case remanded for further proceedings.

BAZELON, Circuit Judge (concurring in part and dissenting in part).

I agree that the order under review must be vacated for the reason stated in Part I of Judge PRETTYMAN'S opinion. But, from the balance of the opinion, holding the order otherwise proper, I am compelled to dissent.

The Commission's order, in effect, if not in terms, authorized United unilaterally to abrogate its two contracts with Mississippi, replacing them by new rates

11. Supra note 7.

and conditions—or, at least, to reform the two contracts. My brethren conclude that the Commission had the power to do what it did under § 5(a) of the Natural Gas Act and that it made the findings required by that section to support its action. I agree that § 5(a) gives the Commission authority "to set aside and modify any rate or contract which it determines, after hearing, to be 'unjust, unreasonable, unduly discriminatory, or preferential.'" United Gas Pipe Line Co. v. Mobile Gas Corp., 1956, 350 U.S. 332, 341, 76 S.Ct. 373, 379, 100 L.Ed. 373. I do not agree, however, that the Commission made the findings necessary to support an exercise of § 5(a) power.

The Supreme Court held in Mobile, supra, that a utility may not, by filing a new rate under § 4 of the Natural Gas Act, unilaterally change a rate to which it has bound itself by contract. The contract rate remains in force until the parties change it by agreement or until the Commission, after hearing under § 5(a), determines it to be unreasonable. A Commission determination that the unilaterally proposed new rate is a reasonable one does not amount to a determination that the old rate is unreasonable. Federal Power Comm. v. Sierra Pacific Power Co., 1956, 350 U.S. 348, 354–355, 76 S.Ct. 368, 100 L.Ed. 388.[1] If the contract rate is to be determined to be illegal, it must be upon a finding, supported by evidence, that the rate adversely affects the public interest—"as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory." Id. 350 U.S. at page 355, 76 S.Ct. at page 372.

Here there are two contract rates. United's conversion tariff proposed a continuation of a two-rate schedule, but an increase of the rate specified in the earlier of the two contracts. The Commission rejected this proposal and ordered filing of a single rate, higher than the rate of the first contract and higher even than the rate to which United proposed to increase it,[2] but lower than the rate of the second contract.

The Commission's order adopted the examiner's Initial Decision of July 18, 1955, with a modification to which I shall refer later. That decision, which occupies 111 pages in the joint appendix, culminates in 24 combined "Findings and Conclusions." In No. 2, the examiner declared that "United's rates, charges, classifications, and services * * * are subject to the jurisdiction of the Federal Power Commission *under the provisions of Section 4 of the Natural Gas Act.*"[3] In No. 17, he found the "just and reasonable" rates to be those earlier agreed upon in the settlement to which Mississippi was not a party, such rates being "the same as made to all other pipe-line customers served from United's trans-

---

1. Affirming our decision in Sierra Pacific Power Co. v. Federal Power Comm., 1955, 96 U.S.App.D.C. 140, 223 F.2d 605. We there pointed out, citing Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 1951, 341 U.S. 246, 251, 71 S.Ct. 692, 95 L.Ed. 912, that "[s]ince 'statutory reasonableness is an abstract quality represented by an area rather than a pinpoint', the statutory purpose may be satisfied by more than one rate." 96 U.S.App.D.C. at page 142, 223 F.2d at page 607.

2. Mississippi argues that, since § 5(a) forbids the Commission to order a rate increase "unless such increase is in accordance with a new schedule filed by such natural gas company * * *," the order is invalid with respect to the gas purchased under the first contract. But, as the Supreme Court said in Mobile, "if the Commission, after hearing, determines the contract rate to be so low as to conflict with the public interest, it may under § 5(a) authorize the natural gas company to file a schedule increasing the rate." 350 U.S. at page 345, 76 S.Ct. at page 381. The order here, instead of *authorizing* the filing of a new schedule, *orders* it. Since it is obvious that United wishes to file such a schedule, the use of "order" instead of "authorize" is in this case insignificant. Hence, if the Commission had made a § 5(a) determination to support its order, I would have no difficulty sustaining the order.

3. Emphasis supplied throughout.

mission system in the Central Rate Zone." In No. 19, he said that to have two rates to Mississippi would "constitute the maintenance of an unreasonable difference in rates and charges for the same service at the same delivery point, contrary to the provisions of *Section 4 (b) of the Natural Gas Act.*" Finally, in No. 20, he declared that "[c]ompliance with *Section 4 of the Natural Gas Act* will be effected by the making of a filing by United which will eliminate unjust, unreasonable and unduly discriminatory rates to Mississippi and which will apply to Mississippi the same rates which are now applicable to all its other pipe-line customers served from United's transmission system in the Central Rate Zone."

A fair reading of the Initial Decision supports the following observations:

*Item 1*—The examiner treated the proceeding before him as one under § 4 to determine the reasonableness of proposed new rates; not one under § 5(a) to determine the reasonableness of existing rates.

*Item 2*—He made no findings as to the reasonableness of the existing rates.

*Item 3*—He concluded that the proposed rates to Mississippi, to be reasonable, must not be different from the rates to United's other customers in the same rate zone.

*Item 4*—He concluded that maintenance of dual rates to a single customer for the same service at the same point is unreasonable *per se.*[5]

Items 1 and 2 above are, in my view, enough to call for reversal of the Order under the decisions in Mobile and Sierra, supra.[6] It is true that the Commission, in adopting the examiner's decision as its own, did seek to bring it within Mobile and Sierra[7] by amending Finding No. 2 to cite § 5 of the Natural Gas Act, as well as § 4. This afterthought cannot suffice, however, for the findings which would be necessary to support a § 5 determination are altogether lacking. See Sierra Pacific Power Co. v. Federal Communications Comm., 96 U.S.App.D.C. at page 144, 223 F.2d at page 609.

Even if Items 1 and 2 were not enough to dispose of this case and we were required to address ourselves to the sufficiency of the determinations referred to in Items 3 and 4, I would hold that they do not support the order.

As to Item 3, I think the Supreme Court pointed out clearly enough in Mobile that mere difference in rates between customers is not unreasonable under the Natural Gas Act, as it is under the Interstate Commerce Act. "The Natural Gas Act * * * recognizes the need for private contracts of varying terms and expressly provides for the filing of such contracts as a part of the rate schedules." 350 U.S. at page 345, 76 S.Ct. at page 381.

Similar considerations, I think, apply to Item 4. If the nature of the industry is such as to cause a gas buyer to make a long-term contract with a pipe-line for his requirements, it seems obvious that the buyer may revise his conception

5. The Commission also relies upon the examiner's Finding and Conclusion No. 13 that all gas delivered by United to Mississippi was commingled before delivery, so that a two-rate system was not feasible. To the extent that this is a finding, rather than a conclusion, it completely ignores the facts that (1) as of the date of the Commission's order United was in fact delivering gas to Mississippi on a two-rate schedule; and (2) United's proposal was for a continuation of a two-rate schedule. What metering system was employed by the parties to compute payments does not appear. That there was a system which they considered feasible seems clear.

6. I would hold the Commission's order as ineffective to change the other terms of the contract, referred to in Part III of Judge PRETTYMAN'S opinion, as it is to change the rates.

7. Mobile and Sierra had not yet been decided by the Supreme Court when the initial and final decisions in this case were issued. Both cases had, however, been decided by the respective circuit courts of appeals.

of his future requirements and seek to contract for additional gas and the seller, in those circumstances, may ask a higher price under the new contract. There is as little wrong with two contract rates to one customer as with different contract rates to different customers. Any of these rates may be stricken as unreasonable, if found so to be in a proceeding under § 5(a). But, in neither case are the rates unreasonable *per se*.