**AMERICAN LOUISIANA PIPE LINE COMPANY et al., Petitioners,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

No. 18108.

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 7, 1964.

Decided Jan. 22, 1965.

Petition for Rehearing Denied April 15, 1965.

As Amended May 7, 1965.

Fahy, Circuit Judge, dissented.

---

Mr. Charles V. Shannon, Washington, D. C., for petitioners.

Mr. Howard E. Wahrenbrock, Sol., Federal Power Commission, with whom Mr. Richard A. Solomon, Gen. Counsel, Federal Power Commission, was on the brief, for respondent.

Before FAHY, WASHINGTON and DAN-AHER, Circuit Judges.

WASHINGTON, Circuit Judge.

This is a natural gas case, concerning the form of the rates to be charged by the petitioner, American Louisiana Pipe Line Company. Petitioner owns and operates an interstate natural gas pipeline running from southern Louisiana to Michigan. The pipeline began operations in 1956. Currently, American Louisiana sells over 95% of its natural gas to two Michigan corporations, Michigan Wisconsin Pipe Line Company and Michigan Consolidated Gas Company. All three companies are wholly-owned subsidiaries of the American Natural Gas Company

A few words may be said about American Louisiana's past tariff filings. In 1954, the Federal Power Commission issued a certificate of public convenience and necessity to American Louisiana, permitting it to begin building its facilities. A condition attached to the certification stated that American Louisiana must file a tariff satisfactory to the Commission at least 60 days before beginning operations. 13 F.P.C. 380, 393 (1954). A subsequent order reaffirmed this condition and reserved "the right to reject any such proposed tariff and service agreements and to prescribe appropriate tariff and service agreements * * *." 15 F.P.C. 23, 43 (1956). The Commission employs two principal rate forms. The "contract demand" form of rate fixes a set price for gas in dollars and cents per unit on the basis of experience in a test year. This is the conventional rate form in general use for natural gas pipelines. In its brief, the Commission concedes that in most natural gas rate cases the contract demand rate form is to be preferred. That form assures the pipeline customers of a definite price and stable supply. In turn, the set rate level stimulates the pipeline's efforts to cut costs, thereby generating more capital for improvement and modernization of service, eventually resulting in lower charges to the consumer. See 18 F.P.C. 795, 799 (1957) (dissenting opinion). The "cost of service" form prescribes variable rates adjusted monthly so that a pipeline recovers its actual costs plus a fixed return. This rate is apparently used with new enterprises with little or no operating experience on which to base a contract demand rate.

On June 11, 1956, American Louisiana filed a conventional contract demand rate schedule; this was rejected by the Commission. Its principal reason was that American Louisiana was a new enterprise and had no experience on which to base specific rates:

> "As set forth in more detail hereinafter, American Louisiana's cost of service is not sufficiently definitive *at this time* to support specified unit demand and commodity rates, such claimed costs of service appear excessive, and the proposed contract demand tariff does not seem appropriate for the sales to affiliates *for the initial few years of service.*
>
> &ast; &ast; &ast; &ast; &ast;
>
> "We find that a cost of service type of tariff is necessary and proper here *for the initial few years of service* to protect American Louisiana (and its parent) if costs increase before increased rates can be made effective and to protect the public against excessive rates during the period required to properly determine costs of service and to effect rate reductions." (Italics added.) 16 F.P.C. 779, 780–81 (1956).

The Commission prescribed a cost of service tariff "for the initial few years of service."

On March 18, 1957, American Louisiana again filed a tariff based on a contract demand rate schedule. The Commission rejected this filing by a vote of 3–2. Viewing the contract demand filing as "premature," the majority found:

> "The brief period of actual operation does not yield sufficient experience to justify a change from the prescribed cost of service form of rate schedule to a contract demand rate schedule." 18 F.P.C. at 798.

This rejection was expressly stated to be without prejudice to a future filing after sufficient operating experience had been accumulated. The inter-affiliate character of American Louisiana's sales, which had been a factor in the rejection of the original filing, was not treated as an operative fact in this decision.[1]

On April 6, 1959, American Louisiana filed the contract demand tariff involved in this proceeding. At that time American Louisiana had been in operation for more than the two-year period suggested in the Commission's 1957 decision as a prerequisite to the granting of a contract demand rate. After a field audit, on July 12, 1961, the Commission staff joined in a stipulation of American Louisiana's overall cost of service (the annual revenue required to enable it to recover its operating costs and the allowed return on its rate base), based on test year operations for the year 1960. The Commission approved the stipulation, by order of October 20, 1961, with some modifications not here relevant. The Presiding Examiner approved the change in rate form requested by American Louisiana. The level of rates was lower than the level originally requested by American Louisiana, however; it was based on the cost of service stipulated for the test year 1960.

The Commission rejected the Presiding Examiner's decision insofar as it permitted the change in rate form. It relied exclusively on the fact that American Louisiana sells virtually all of its gas to affiliates. In its Opinion and Order No. 387 issued May 16, 1963, the Commission ruled:

> "We conclude that, contrary to the examiner, American Louisiana's change from a cost-of-service to a conventional rate should be denied. As years of regulatory experience attest, sales to affiliates present possibilities of abuse and should be scrutinized with care. &ast; &ast; &ast; A cost-of-service rate affords us an effective and feasible means of supplying the desired supervision. Under such a rate, the seller's charges to its affiliates are computed on the basis of its actual costs for succes-

---

1. The two dissenting Commissioners would have affirmed the Presiding Examiner's acceptance of the contract demand tariff filed.

sive billing periods, plus the return allowed. Thereby the seller is permitted all costs to which it is entitled but no more, thus achieving the desideratum of utility rate regulation.

\* \* \* \* \* \*

"These arguments of Michigan Wisconsin [American Louisiana] do not support the requested change, nor was any evidence adduced to support it. American Louisiana is undeniably an affiliate of Michigan Wisconsin and Michigan Consolidated, which purchase in excess of 95 percent of its gas. These circumstances justify applying to it requirements not invoked against companies otherwise situated. \* \* \* And on the present facts, we conclude that we can best attain the objective of rate regulation—the allowance of all proper costs and return but no more—by requiring the continued use of a cost-of-service form of rate." (Footnotes omitted.)

American Louisiana has petitioned this court under Section 19(b) of the Natural Gas Act of 1938, 52 Stat. 831, as amended, 15 U.S.C. § 717r(b) (1958), to review this decision imposing a cost of service rate form. It has been the Commission's regular practice to require established natural gas pipelines to sell on a contract demand basis. This practice is reflected in its regulations, which provide that a cost of service rate form will be allowed only "Upon application and for good cause shown." 18 C.F.R. § 154.52. The regulations also state, with exceptions not here relevant, that "all rates shall be clearly stated in cents or in dollars and cents per unit," and that "No \* \* \* price adjustments or periodic changes shall be included in the rate schedule or any other part of the tariff which in any way purports to effect the modification or change of any rate or charge \* \* \*." 18 C.F.R. § 154.38.

■ In the case before us, the Commission seeks to justify its departure from its established practice on the ground that inter-affiliate sales present special difficulties for effective rate regulation in the public interest. But the view that the seller's affiliation with its customers was to be the decisive factor in determining rate form was new, and American Louisiana had no notice of it before the Commission's decision was handed down.[2] Fairness to American Louisiana would require that it be given an opportunity to address itself to the significance to be attached to the inter-affiliate character of the regulated sales. As has been noted, the Commission's 1957 refusal of American Louisiana's contract demand tariff filing was based on American Louisiana's lack of operating experience. Nothing was stated about its affiliation with its customers.

The tariff involved in this litigation was filed on April 6, 1959. On August 31, 1961, American Louisiana's rate filing was consolidated for hearing with rate filings of its customer, Michigan Wisconsin. Hearings were held from January 30 to February 20, 1962. No evidence was introduced attacking American Louisiana's contract demand tariff.[3]

2. The Commission, in its brief, cites two cases in which it has imposed a cost of service rate. Both decisions involved new enterprises with no test years on which to base a contract demand rate. In one, the seller has since been merged with its customer. Permian Basin Pipeline Co., 12 F.P.C. 85 (1953), 24 F.P.C. 1208 (1960). More significant for our purposes is Trunkline Gas Supply Co. In its first proceeding, the Commission imposed a cost of service rate, noting that Trunkline was essentially an operating subsidiary of its principal customer. 9 F.P.C. 721 (1950). In 1962, without discussion of the affiliation question, Trunkline was permitted to shift from the cost of service rate to contract demand. 27 F.P.C. 930 (1962). If there was any relevant change in Trunkline's operation, other than the accumulation of operating experience over time, during the period between these two decisions, the Commission has not brought it to our attention in its brief. (Indeed, the brief omits any mention of the second Commission decision.)

3. Counsel for Michigan Gas and Electric, an intervenor in the proceedings and a

The focus of the hearing was Michigan Wisconsin's split between commodity and demand rates. There was no suggestion that the matter of affiliation would be regarded as dispositive. Hence, we are told, American Louisiana did not introduce evidence on the question.

We think that fairness requires that American Louisiana should have had an opportunity to address itself to this matter. Cf. Hill v. Federal Power Commission, 335 F.2d 355 (5th Cir. 1964). In its application for rehearing it sought such an opportunity:

> "It is respectfully submitted that, for the reasons hereinafter set forth, an opportunity should be provided to make a full and adequate presentation directly to the Commission of the reasons why American Louisiana should adhere to a conventional contract demand (CD–1) form of rate instead of being required to revert to a cost-formula (CS–1) rate and why the considerations adverted to the Commission's opinion and order do not justify the imposition of a cost-formula rate on American Louisiana and its customers.
>
> "It did not appear necessary or appropriate to discuss this question at the oral argument before the Commission on February 26, 1963. American Louisiana was very properly under the impression, on the basis of the Commission's prior orders, that it had satisfied all of the conditions requisite to the acceptance of a conventional contract demand form of rate."

customer of Michigan Wisconsin, raised the only objection to American Louisiana's rate form change. He stated:
> "We are objecting to the departure from the cost-of-service form of rate in American Louisiana, which again was established by the Commission for good and sufficient reasons, and we have not as yet heard any reasons for departing from it."

His opposition was unsupported by any evidence. This objection was renewed in Michigan Gas' exceptions to the Presiding Examiner's decision.

The application was denied.

The Commission seemed to assume that American Louisiana had the burden of proving the reasonableness of its proposed rate form. In its opinion, for example, the Commission stated that American Louisiana's arguments "do not support the requested change, nor was any evidence adduced to support it." In the view we take of Section 4(e) of the Natural Gas Act, 15 U.S.C. § 717c (e), and the proceedings in this case, the Commission's assumption is unwarranted. Section 4(e) states in part:

> "At any hearing involving a rate or charge *sought to be increased,* the burden of proof to show that the *increased* rate or charge is just and reasonable shall be upon the natural-gas company * * *." (Emphasis supplied.)

It is our view, and the respondent's brief seems to concede as much, that Section 4(e) governs as to burden of proof, and that the burden of proof is on the gas company only if an increase in rates is involved. If the change in rate is not an increase, the burden of proof is on the party attacking the filed tariff or on the Commission if it attacks the tariff.[4]

Some confusion might arise from the fact that the tariff American Louisiana originally filed in this proceeding on April 6, 1959, did involve an increase in rate level as well as a change from cost of service to contract demand rate form. These rates went into effect on November 1, 1959, after the statutory five months suspension period, subject to refund.

> In view of the language used by the Commission in its prior decision rejecting American Louisiana's contract demand filing, we think that this introduction of the affiliation issue was insufficient to apprise American Louisiana that it was going to be decisive in the Commission's approach to the case.

4. If we took the view that the Commission was acting under Section 5(a), 15 U.S.C. § 717d(a), it would still have the burden of showing that the contract demand rate was "unjust, unreasonable, unduly discriminatory, or preferential."

On July 12, 1961, American Louisiana and the Commission entered into a stipulation based on the experience of a test year, 1960. By its terms, for the period during which the filed tariff was in effect, up to December 31, 1960, American Louisiana was to refund to its customers a total of $2,044,961, the difference between its cost of service and the revenue actually collected under its filed tariff. The stipulation also set forth a new schedule of interim contract demand rates which replaced the rates originally filed by American Louisiana. These rates were designed to generate revenues that would equal the cost of service of the test year, 1960, normalized for known changes —$56,261,267.[5] Hence, on the face of the tariffs, no increase in rate was involved at the time of the hearing. This is the time that is relevant under Section 4(e).[6]

■■■ We do not think that the fact that the tariff *originally* filed by American Louisiana was a rate increase gave it the burden of proof throughout the proceeding. After the stipulation, American Louisiana scaled down its requests so that the projected revenues beginning January 1, 1961, would equal the cost of service for 1960, normalized for known changes; thereafter, only a change in rate form was involved.[7] The stipulated rates were to become effective on January 1, 1961. In deciding whether the new rate is an increase over the old rate, one naturally compares the revenue generated in the preceding period (calendar 1960) under the old rate with the revenue anticipated under the new rate during calendar 1961. In making this comparison the actual revenue collected in 1960 is not the relevant figure, since these revenues were collected under American Louisiana's filed tariff, which went into effect on November 1, 1959. The relevant figure is the cost of service for 1960 (expenses plus allowable re-

5. The rates originally filed by American Louisiana were higher in each category (except one in which the rate was the same) than those stipulated on July 12, 1961:

|  | Original Tariff | Stipulated Interim Rates |
| --- | --- | --- |
| Demand charge | $3.61/Mcf | $3.47/Mcf |
| Commodity charge | .27 | .265 |
| Development rate | .43 | .43 |
| Small General Service Rate | .48 | .45 |

The design of the rates was modified in a Supplemental Stipulation entered into on November 8, 1961, as follows: demand charge, $2.325/Mcf; commodity charge, $.301/Mcf; Small General Service Rate, $.45/Mcf. Presumably these rates were designed to produce the same revenue level as the interim rates in the original stipulation. The Supplemental Stipulation was rejected by the Commission because of the lack of agreement of all parties and remanded to the Trial Examiner for determination in ordinary course (Jan. 12, 1962). After further hearing, the Trial Examiner incorporated the rates from the Supplemental Stipulation in his decision of Sept. 27, 1962.

6. The statutory provision states: "At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable" should be on the proponent of the rate. Natural Gas Act, § 4(e). The fact that an original filing requested an increase does not leave the burden of proof on the proponent if before the hearing it revises its request so that an increase is no longer requested. In that event the hearing is not one "involving a rate or charge sought to be increased." Hence, the burden is not on the proponent. The policy behind the statute bolsters this interpretation. The burden of proof is to be borne by a gas company seeking an increased rate so that the consumer receives maximum protection. But a gas company which once sought an increase, then abandoned its requested increase, presents no such threat to the consumer. It should be treated the same as any other gas company which seeks a rate change other than an increase.

7. The table appended to the stipulation suggests that there is an increase in cost of service of $64,216 due to a change in bookkeeping conventions as they relate to depreciation deductions in the calculation of the Federal income tax. We do not regard this change as an increase in rate, justifying the placing of the burden of proof on American Louisiana. Clearly, the intent of the stipulation was to match the 1960 revenues, not to increase them.

turn—6% of the rate base); this figure states how much would have been collected under American Louisiana's old rate. The comparison of this figure, normalized for known changes, with the new rate shows that the new rate was not conceived as an increase in rate level.[8]

Based on the stipulated rates, there is no rate increase, unless the shift in form is itself an increase in rate level. A change of rate form designed to generate revenues equal to the actual revenues of the preceding year less appropriate refund and normalized for known changes is not, on its face, a rate increase. The Commission in its brief seems to suggest two possible reasons for considering the change in form an increase. First, it argues that a change from cost of service to contract demand *necessarily* involves a rate increase. But this proposition is novel, and it has no support in the record. Second, the Commission argues that the change in form is equal to an increase of rates on the facts of this case; but the facts on which the Commission relies again have no basis in the record. For example, the Commission asserts that American Louisiana is a declining rate base company so that a cost of service rate would constantly decline, leading to savings for consumers. Hence, the adoption of a contract demand rate, with constant charges, would amount to a rate "increase." This is a disputable matter which American Louisiana should have

an opportunity to argue in an adversary hearing. Petitioners convincingly argue in their brief in this court that the Commission's analysis of American Louisiana's future financial status is oversimplified and misleading.[9] The placing of the burden of proof on American Louisiana by the Commission is unjustified because of the absence of a prior determination, on evidence, that the proposed change involves an increase in rates.[10] Furthermore, even if these theories were supported by the record, if the Commission was going to rely on either of them to establish the existence of a rate increase, American Louisiana should have been forewarned and given an opportunity to dispute the theories. Then if either of the positions here urged had been sustained, American Louisiana could have attempted to bear the burden of proof they would impose.

On remand, the Commission should first determine whether the proposed change in form is also an increase in rate. We are not prepared to say, as a matter of law, that a shift from cost of service to contract demand rates, pegging the new rate to the cost of service in the preceding year, can never be regarded as a rate increase under Section 4(e). That section could be read as placing the burden of proof on the proponent of a new rate which would maintain the existing revenues of a pipeline whose revenues would otherwise have decreased. But the

---

8. It would be inappropriate to compare the revenue level anticipated under the new rate, beginning January 1, 1961, with the cost of service revenue of some period prior to 1960. Suppose the new revenue level were higher than the revenues collected in 1959. That would not establish that the change was a rate increase, if, as is the case here, the new revenue level was the same as the normalized revenue level in 1960. Nor would the fact that the new revenue level was lower than the 1959 level establish that a rate decrease was involved. As a matter of common sense, the comparison should be made with the immediately preceding revenue period.

The fact that the actual rates in 1960 were collected under American Lou-

isiana's newly-filed tariffs is irrelevant. The stipulation pierced these rates and made American Louisiana refund the difference between the cost of service for the year and the revenue collected.

9. In its 1956 decision, the Commission noted that a contract demand rate was not in American Louisiana's interest, since it does not make allowance for possible increases in costs the way a cost of service rate does. See quotation given *supra.* Both arguments urged here for finding this change in form a rate increase seem at odds with this earlier view.

10. Obviously, in a case involving the reasonableness of a rate change, the placing of the burden of proof is of great significance.

decision could only be made after inquiry.[11]

■ It may be argued that, even if the Commission had the burden of proving American Louisiana's rate unreasonable, it adequately supported the burden. We do not find this argument convincing. The asserted need for cost of service rates for effective regulation of inter-affiliate sales has no basis in this record or, so far as appears, in the Commission's prior proceedings. With all respect for the Commission's expertise, we do not think that the Commission's opinion, reached without hearing or argument, that a contract demand rate is unreasonable for a pipeline which sells principally to affiliates, adequately bears its burden of proving unreasonableness in this case. While we concede that inter-affiliate transactions present special regulatory problems, "possibilities of abuse" presented by inter-affiliate sales do not support the conclusion that such sales must be made on cost of service rates. The Commission's "years of regulatory experience" cannot substitute for facts.[12] A great part of the Commission's brief is devoted to showing that the shift in form is actually a way of increasing profits. As we have noted above, we are not convinced by anything in the record that this change in form would necessarily increase profits and rob the consumer of future savings. And if the change in form does not do this, it would be hard to say that the change is unreasonable.

■ On remand the Commission should first decide whether the change in rate form is the equivalent of an increase in rate level, and place the burden of proof accordingly. After deciding this preliminary point, the Commission should hold an evidentiary hearing and decide whether the change to contract demand is reasonable, unreasonable on the facts of this case,[13] or unreasonable *per se* in any case involving inter-affiliate sales of gas. If the last alternative is thought proper, the Commission should provide other interested parties an op-

11. Whether a pipeline's cost of service increases or decreases depends on a wide range of variable such as labor costs, tax rates, price of gas from the field producer, financing costs. It would be difficult indeed to state with confidence that a pipeline's cost of service will increase or decrease in any future period.

12. The Commission's opinion cites Mississippi River Fuel Corp. v. Federal Power Commission, 102 U.S.App.D.C. 238, 252 F.2d 619, cert. denied, 355 U.S. 904, 78 S.Ct. 331, 2 L.Ed.2d 260 (1957), to support its assertion that "years of regulatory experience" justify its special treatment of inter-affiliate transactions. That case is clearly distinguishable, however. There the inter-affiliate sale was *unregulated.* The issue arose in the context of a regulated sale of gas by the United Gas Pipe Line Company. The buyer challenged United's inclusion of its increased cost of gas as a cost of service. United purchased its gas from an affiliate. This court stated that the original sale must be scrutinized before approval of United's cost of service. But there was no suggestion that it was improper for the inter-affiliate sale to be made under a fixed price contract. Our opinion also suggested that the price set by the parties to inter-affiliate sales need be set aside only upon a showing of abuse. We remanded the case to the Commission "to inquire into the factual justification for the price increases" in the contract between the two affiliates.

Where, as in this case, the rate in an inter-affiliate sale is regulated by the Commission, the problem considered in that case would be far less critical. There is no suggestion of "abuse."

It certainly does not follow from that case that the Commission's decision in the present case must be sustained. This kind of "regulatory experience" cannot be used to sustain the Commission's conclusion here. See Washington Gas Light Co. v. Baker, 88 U.S.App.D.C. 115 at 120–121, 188 F.2d 11 at 16–17 (1950).

13. In exploring this possibility the Commission might consider such things as the debt structures of the affiliated corporations, the independence of the management, the commingling of assets, and their bookkeeeping procedures. If the affiliated corporations are in fact run as separate entities and the rates for sales between them are under Commission supervision these might be highly revelant factors.

portunity to be heard. 5 U.S.C. § 1003 (a). There is no need for us to express any views on the merits of this question at this time.

For the above reasons, the Commission's decision must be reversed and the matter remanded to it for further hearings not inconsistent with this opinion.

So ordered.

FAHY, Circuit Judge (dissenting).

I would affirm the Commission in this case.

## I

The court takes the position that the Commission's view that the seller's affiliations with its customers was a decisive factor in determining rate form is a new principle of which American Louisiana had no notice before the Commission's decision, and that fairness would require that it be given an opportunity to address itself to the significance to be attached to the inter-affiliate character of the regulated sales. I find no unfairness, lack of opportunity, or indeed lack of address upon the subject. The hearings before both the Commission and the Trial Examiner show that a vital consideration with respect to the rate form issue was American Louisiana's inter-affiliate operations.

The Presiding Examiner, prior to the decision of the Commission, refers to the opposition filed by Michigan Gas & Electric Company to American Louisiana's proposed changeover to the contract-demand form of rate. He stated that such opposition "rested upon the small number of Am Lou's customers and the close affiliation of its two principal customers (Mich Wis and Mich Con), factors not affecting Mich Gas and obviously 'borrowed' from the Commission's early decision in the matter." The Examiner answered this opposition, *inter alia*, as follows:

"Michigan Gas is not a customer of Am Lou and its inferences as to Am Lou's possible undue preference of its two affiliates and its concomi-

tant possible undue prejudice against its five non-affiliated distributor customers have been previously presented to and ruled upon by the Commission in several cases * * *."

The position eventually taken by the Commission was thus considered by the Examiner and decided favorably to American Louisiana. Michigan Gas & Electric thereupon filed exceptions to the Examiner's decision, pointing out:

"American Louisiana sells practically all of its gas to its affiliates, Michigan Wisconsin and Michigan Consolidated. Up until now, the Commission has required that it use a cost of service form of rate in which its charges to its affiliates are based upon its actual costs classified in accordance with the Commission's established procedure.[14]

"This is sound because it avoids the possibility of an inter-affiliate transaction being used as the means of siphoning off, or concealing, the profits of the affiliated customers. American Louisiana is truly a department of the affiliates. The American Natural Gas System cannot be hurt by a cost of service tariff because American Louisiana is assured its cost of service. Obviously, it is seeking a device to obtain something more. The Staff has taken no position on the question.

"The Examiner erroneously relied solely on the fact that a stipulated cost of service had been approved to justify his conclusion that the demand-commodity rate should be adopted. However, the Commission, in the same order in which the stipulated cost of service was approved, assigned for decision the question of rate form. Therefore, the Examiner erred in treating the Commission's approval as decisive.
"[14] *American Louisiana,* 16 FPC 779; *American Louisiana,* 18 FCP 795."

In American Louisiana's argument of the case to the Commission, counsel who now presents the case to this court ex-

534

plicitly referred to the opposition of Michigan Gas & Electric. He stated it was disposed of in his brief before the Commission and had been properly rejected by the Examiner. This again demonstrates American Louisiana's knowledge of the opposition, based on the inter-affiliate relationships, to the contract-demand form of rate. It was a matter to be considered and decided. Furthermore, after the decision of the Commission, rejecting American Louisiana's position, American Louisiana sought rehearing and oral argument in an elaborate written application filed with the Commission. In this application there is not the slightest indication of a desire to introduce any further evidence, or the slightest dissatisfaction with the record as made. The application was devoted wholly to arguments based on the record.[1] The effort was to persuade the Commission to a different conclusion. To use the application's language,

> "an opportunity should be provided to make a full and adequate presentation directly to the Commission of the reasons why American Louisiana should adhere to a conventional contract demand (CD–1) form of rate instead of being required to revert to a cost-formula (CS–1) rate and why the considerations adverted to in the Commission's opinion and order do not justify the imposition of a cost-formula rate on American Louisiana and its customers.

> "It did not appear necessary or appropriate to discuss this question at the oral argument before the Commission on February 26, 1963. American Louisiana was very prop-

erly under the impression, on the basis of the Commission's prior orders, that it had satisfied all of the conditions requisite to the acceptance of a conventional contract demand form of rate. * * *"

The application was a lengthy argument against the Commission's decision, based on the record upon which the decision rested. It sought no amplification of the record. The denial of this application was a rejection of American Louisiana's position, not a denial of opportunity to American Louisiana to present its position, except by further oral argument.

The court's opinion does not dispute that American Louisiana was on notice throughout the proceedings that the rate form was an open issue. And American Louisiana knew it had to justify its proposed change in light of the objections to its inter-affiliate operations.

I add that no requst has been made under the applicable statutory provision [2] to obtain a remand by this court to the Commission for the taking of additional evidence, and finally, American Louisiana's brief in this court does not complain that it was denied the opportunity to enlarge the record; it complains of the conclusion reached by the Commission on the present record.[3]

I accordingly would not remand but would decide the validity of the Commission's order on the present record.

II

The proceedings were conducted from their beginning as a rate increase case. A rate level increase was effected when the proposed contract-demand tariffs were filed.[4] It may be true that in some

1. Thus, the statement in the court's opinion, p. 529, that we are told American Louisiana did not introduce evidence of the subject of affiliation because there was no suggestion it would be dispositive I think is unjustified. Moreover, this issue was not required to be labeled as "dispositive."

2. Natural Gas Act, § 19(b), 52 Stat. 831 (1938), as amended, 15 U.S.C. § 717r (b) (1958).

3. American Louisiana's primary contentions are that the burden is upon the Commission to prove that the form of rate filed by American Louisiana was unjust and unreasonable and that the Commission's decision does not contain findings essential to support its order.

4. The requested changeover from the pre-existing month to month cost-of-service rate form to American Louisiana's proposed contract-demand tariff with fixed

cases a change in rate form, of itself, is not a rate increase. But in this case the change-over from cost-of-service to the contract-demand rate form was inseperable from the rate level increase requested. In such a situation Section 4(e) of the Natural Gas Act explicitly casts the burden of proof upon American Louisiana "to show that the increased rate or charge is just and reasonable." 52 Stat. 822 (1938), 15 U.S.C. § 717c(e) (1958). This burden was not sustained.

The court suggests that the stipulation of July 12, 1961, somehow changed the character of the case insofar as the burden of proof is concerned.[5] Even assuming as the court does, see its footnote 6, that the question of increase or no increase is to be determined as of the time of hearing rather than at the time of original filing,[6] nevertheless the answer cannot be "an increase is no longer requested" if at the time of the hearing the rates then sought, as contained in the stipulation, remain an increase over the rates which preceded the filing of the disputed tariffs. Nor is the question answered by saying that the stipulation was "designed to generate revenues that would equal the cost of service of the test year, 1960, normalized for known changes"; for 1960 is not the year in which the rates immediately prior to filing of a new tariff were in effect. The mistake of the court, it seems to me, is manifested by its comparison of the conditionally stipulated rate with the 1960 revenues under the cost-of-service rate rather than with such revenues of the

year prior to the filing of the new tariffs. The stipulated rate could not be relevant unless it would have been no increase over the rate in effect before the disputed tariffs were filed.

American Louisiana seems to admit that the contract-demand form produces increased unit revenues over those produced by their previous cost-of-service rate. In their brief, petitioners state:

"The second assumption inherent in the Commission's approach is that a pipeline company should be denied any opportunity to earn *more* than some fixed rate of return, as might be possible under specific rates if the company were able by operating more efficiently to reduce its unit cost of service. \* \* \* [Original emphasis.]"

It is clear that in making the change-over, American Louisiana contemplated that the specific dollars and cents form of the contract-demand rate would allow greater revenues. Indeed it is unrealistic to take the position that the dissatisfaction of American Louisiana with a rate which permits it to obtain "its proper cost-of-service and return" is due to other than the fact that the contract-demand rate it seeks would permit it to obtain more.

### III

Apart from the question whether the proposed changeover in rate form involved a rate increase as to which American Louisiana must sustain the burden of proof under Section 4, the

---

demand and commodity charges was answered by the Commission as follows: "Based on actual sales for the calendar year 1958, the proposed tariff would effect an increase of $916,497 in revenues."

5. The court fails to take into account the contingent nature of the stipulated cost-of-service figure based on 1960 as a test year. It was to be binding only if the contract-demand rate form were approved. More importantly, the fact that the conditionally stipulated interim tariffs would have been less in amount than the originally filed tariffs, of which approval had been sought, see footnote 5 of the

court's opinion, has no bearing on the question whether the change-over from cost-of-service rate form to contract-demand was a rate increase. It is not relevant that the conditionally stipulated rate might have been less than the filed tariffs.

6. I accept this assumption only *arguendo*. For if the new tariff increased the rates, it seems to me American Louisiana must sustain the burden of demonstrating that any concession in the rates during the hearing wiped out the increase originally sought.

Commission was in any event justified in concluding, contrary to the Examiner, that American Louisiana's change to a conventional rate should be denied. Under Section 5(a) of the Natural Gas Act, 52 Stat. 823 (1938), 15 U.S.C. § 717d (1958), the Commission has the power to declare unlawful "any rate, charge or classification demanded, observed, charged or collected" and, under that section, to determine the just and reasonable rate and fix the same by order. See Mississippi River Fuel Corp. v. FPC, 102 U.S.App.D.C. 238, 243, 252 F.2d 619, 624 (1957). As to the interdependence of Sections 4 and 5 of the Natural Gas Act, see United Gas Pipe Line Co. v. Mobil Gas Co., 350 U.S. 332, 341–345, 76 S.Ct. 373, 100 L.Ed. 373 (1956).

The Commission found that American Louisiana's contract-demand rate form as proposed was "unlawful under the Act and should be disallowed"; and it provided that American Louisiana's "just and reasonable rates for the future are as prescribed" in the Commission's order. The opinion gave adequate reasons for these conclusions, with adequate support in the record. It pointed out the special circumstances posed by American Louisiana, which sells practically all of its gas to affiliated companies. As was urged upon the Commission, the cost-of-service form of rate "minimizes inter-affiliate transactions which afford the possibility of manipulation and excessive earnings."[7] And the Commission stated:

"the seller's charges to its affiliates are computed on the basis of its actual costs for successive billing periods, plus the return allowed. *Thereby the seller is permitted all costs to which it is entitled but no more,* thus achieving the desideratum of utility rate regulation." (Emphasis supplied.)

It is uncontested that the form of rate prescribed by the Commission does permit American Louisiana to recover all costs to which it is entitled, plus a return which on this record cannot be said to be unjust or unreasonable.

We note that an earlier Commission order denied American Louisiana's request to change from a cost-of-service rate "on the ground of insufficient operating experience to evaluate claimed costs, but without prejudice to its filing again to change." On this basis American Louisiana contended that it had acquired sufficient operating experience and that its costs were reasonable as shown by the stipulation of July 12, 1961. The Commission was nevertheless free to conclude, as it did, that neither this contention nor the evidence supported the changeover. As the Commission stated:

"American Louisiana is undeniably an affiliate of Michigan Wisconsin and Michigan Consolidated, which purchase in excess of 95 per cent of its gas.[12] These circumstances justify applying to it requirements not invoked against companies otherwise situated * * * And on the present facts, we conclude that we can best attain the objective of rate regulation—*the allowance of all proper costs and return but no more*—by requiring the continued use of a cost-of-service form of rate. (Emphasis supplied.)

"[12] The remainder is purchased by five non-affiliated distributing companies."

The dollars and cents contract-demand form of rate may have permitted larger

---

7. It is obvious that the usual incentive to reduce costs under the dollars and cents contract-demand rate form is complicated when inter-affiliate transactions are involved. The affiliated seller's savings (hence increased revenues which escape adequate regulation) and the affiliated buyer's savings inure to the American Natural Gas System as a whole. And since the cost of gas to municipal public utilities would be at a fixed rate the non-affiliated utilities and the ultimate consumer do not receive the benefits of these savings which would be passed on to them under the cost-of-service rate form as it is adjusted monthly.

profits to the seller through savings in costs, but the Commission was not required to approve it so long as the pre-existing cost-of-service rate form was just and reasonable. This it was since it allowed "all proper costs and return but no more."